Please be seated. Mr. Clerk, will you call the next case, please? 312-0439, People of the State of Illinois, Appalachia, by Thomas Dorado v. Devante Jordan, Talent, by Thomas Bradstead  May it please the Court, Good afternoon. My name is Thomas Bradstead. I represent Devante Jordan on his appeal to this honorable court. At the time of the trial, Mr. Jordan was 23 years old. He was found guilty after a jury verdict in favor of mob action and sentenced to 75 years in prison. It is our respectful position that Mr. Jordan's trial, the verdict that resulted the suspect, based on several significant errors, two of which we believe call for outright reversal. I hesitate to rank issues, but the most troubling issue this afternoon that I'd like to speak to first is the introduction of two videotaped statements by state witnesses, Mr. Shorty and Mr. Teague. Each of the witnesses, although never referred to as hostile, remembered very little of the incident that was at issue. I think both of them testified that at the time of the event, at the time of their statements to the police, they were under the influence of alcohol and drugs. But basically, the bottom line at trial, neither witness added to the state's case or advanced the defendant's case. They didn't remember. Each of the witnesses, Mr. Shorty and Mr. Teague, had given previous statements to the police, both videotaped. At the request of the state, they moved to play the videotape to the jury of Mr. Shorty. The damaging, prejudicial part of this statement is an alleged admission by Mr. Jordan to the murder. Mr. Shorty was not at the scene of the offense. Allegedly, Mr. Jordan saw him the next day and made this admission. Let me move on. Mr. Taylor, same way at trial, didn't remember much, gave a statement to the police. He remembered being in the car. He remembered Mr. Jordan being in the car. He didn't remember him shooting. He was under the influence of drugs. But basically, didn't remember much at trial. Again, the defense objected to the playing of his two-hour videotape to the jury. And on each occasion, the trial court stated that it was going to allow this evidence as impeachment. I think it's clear that Mr. Shorty's statement could have come in under no other guise because he had no personal knowledge of the event itself, so he doesn't qualify under 11510. Mr. Taylor may be a little bit different, but Mr. Shorty particularly. He said he wasn't there. They were only bringing this in to show Mr. Jordan's admission. The reality is that the state's attorney argued both videotapes to the jury as substantive evidence, and the jury was instructed that they could consider prior statements by witnesses as substantive evidence if certain of the 11510 factors which are set out in the instructions were present. Particularly Mr. Shorty's statement and his admission was prejudicial to Mr. Jordan. And I think it's the very issue that our Supreme Court has talked about in allowing these hearsay statements to come in through the guise of impeachment when it wasn't impeachment at all but it was argued as substantive evidence. It's unfair to Mr. Jordan. We acknowledge the court's position via people versus letter, and let me preface this by saying that it's also our position that we do not believe that Mr. Taylor and Mr. Shorty's trial testimony set back the state's attorney's theory of defense in any way, shape, or form nor did it advance Mr. Jordan's position or theory of defense. We are aware of the decision of people versus Leonard that indicates that a witness's inability to recollect the prior consistent statement is enough damage to allow the prior inconsistent statement. This case is somewhat distinguishable in that in this case neither witness was considered hostile as the witness in Leonard was. Also in Leonard there was no objection to the admission of the hostile witness's testimony. And at least in Leonard they attempted, the state attempted, to refresh this witness's recollection. None of those things happened in this case. And the basis of our argument, the bottom line of our argument, is that the admission of these two statements under the guise of impeachment when in all reality a serious review of the record of this case indicates they were argued as substantive evidence, the jury was instructed as substantive evidence, and that was error. And the important thing about Shorty's testimony is the jury's military deliberations. They wanted to see it again. This wasn't for impeachment. They thought this was substantive evidence. They wanted to see Shorty's statement that indicated that Mr. Jordan had admitted this crime to him. Highly prejudicial. We asked this court to consider understanding the position in Leonard about the two cases that were cited in Simpson and Wilson that talk about the mere fact that someone doesn't remember a prior statement in and of itself should not be enough to get that statement admitted under impeachment, under the guise of impeachment. And I think the issue, the facts in these cases point out why that's a good mandate, because this jury got to hear this alleged statement, confession by my client, through inadmissible prior inconsistent statement of Mr. Shorty, damning. And courts have recognized the fact that the defendant's admission is probably the most serious and significant of evidence that could be produced against him. I'll move on to the issue of the special prosecutor. It's our position that Mr. Brady subsequently became the state's attorney of Peoria County, and Ivante Jordan had an attorney-client relationship. After Mr. Jordan was arrested, his family went to Mr. Brady's office, retained him, and discussed the case. It's evidenced by the fact that it came out at the hearing that Mr. Brady was aware of Mr. Jordan's possible alibi and where it took place. The defense, upon Mr. Brady's election to the state's attorney's office, made a motion to recuse the state's attorney's office from appointing a special prosecutor. The trial court denied that. The next day, on the state's motion, which cited no authority, did not cite the statute, did not cite a reason, didn't say anybody was sick, didn't say anybody couldn't do it, moved to recuse themselves and ask the court to appoint the state appellate prosecutor. That motion was granted. I believe the state argues that this point is moot based on that subsequent appointment. Our argument is that it is not. Because the subsequent appointment of the special prosecutor, one which was not done by statute, didn't follow the statute, didn't set out any of the reasons the statute requires before a special prosecutor is appointed, did not erase the occurrence of impropriety in this case. Mr. Jordan was prosecuted, or I put it this way, the appearance and the presence of the Peoria County State's Attorney's Office was significant in this trial. The defense counsel made a motion at one point and argued that the Peoria County State's Attorney's Office was fetching documents for the prosecutor, was consulting with him, was in the courtroom almost throughout the whole trial. And what is telling, I think, in this case is the fact that after the appointment of the special prosecutor, he was ready for a murder jury trial less than two weeks later, just over two weeks later, not casting any doubt on this fine gentleman's abilities. That's a pretty significant thing to be able to say after being appointed two weeks ago, I'm ready for trial. I think it supports the appearance that the Peoria County State's Attorney's Office was intimately involved in this case, which creates and embellishes and signifies the appearance of impropriety because the state's attorney in Peoria County had an attorney-client relationship with the defendant. Twice during this trial, the trial court closed the courtroom. It's our position that a closure of a courtroom during a trial, a felony trial, should be a rare circumstance. The Sixth Amendment of our Constitution allows and calls for a defendant in a public trial. Our Supreme Court has listed four reasons why the court might be able to consider closing the courtroom when there's an overriding interest, whether the closure will address that interest, whether alternatives have been discussed, and the fourth one being, slips my mind at the moment, but oh, the factual support. None of those factors were met in this case. And we concede, and I shouldn't say concede, but it is difficult from the record to tell how long the courtroom was closed on each occasion. It occurred once during a voir dire of the jury as to their availability toward the middle of the trial, and the court's reasoning was he didn't want the jury intimidated by the number of spectators in the courtroom. It was a packed courtroom, and as I understand the record, it was packed pretty much during the whole trial. It was also packed during voir dire. And all the information that came out during this closed session came out during the voir dire when the courtroom wasn't closed. So there was no overriding interest. Had there been any incidents or anything? Was it just the sheer numbers that were intimidating, or did he articulate that? My understanding is that the court's concern was that the courtroom was packed and that they were bringing the jurors out to discuss their availability. He was concerned about having all these people here. I guess when certain jurors would be available to continue the trial and deliberations. However, no alternatives were discussed. The jurors could have been given numbers. They could have done it in camera with any jurors who didn't want to talk out loud. But there was nothing in the record that indicated there was any kind of disturbance. And that goes to the second closure where the judge during closing argument and did not identify the spectator, but somebody was getting up, leaving, coming back in. Judge said, enter out, enter out, close the door, don't let anybody else in. We don't know what the disturbance was. It's a public courtroom. Obviously during closing argument every lawyer would like to have some peace around them as he argues. However, there was no specific mention in the record what this particular spectator was doing, why it was necessary to lock the door after he went out or came back in. And therefore the Waller factors as set out by the Supreme Court were not met. Closure of a courtroom during a trial is a structural error and can call for reversal in and of itself. And while my client, Mr. Jordan, maintains his innocence to this day of his crime, it is necessary for us to comment on the sentence imposed. As this court is well aware, the Constitution of the state of Illinois requires the sentencing body balance the seriousness of the offense versus the potential of restoring the offender to societal good. A 75-year sentence on a 23-year-old man is excessive and an abuse of discretion. And while this court and no other court in Illinois requires a sentencing body to give its reasons, specific reasons, in a situation like this it would seem that encouraging the trial court to be more explicit in why such a draconian sentence should be imposed on a 23-year-old boy with no criminal background, employable, strong family support, various people from the community testifying for him at his sentencing and the response from the court was, if you use a gun in a fight and somebody gets killed, you're going to spend the rest of your life in prison. Now, that seems to be foreclosing all kinds of possible dispositions, even for as horrendous a crime as murder. But I think it manifests the court's position in that it did not consider mitigating evidence that was apparent from this record. And while we hope and pray that this honorable court will find that the verdict in this case was suspect based on the errors that occurred at trial, including the closure of the courtroom and the inappropriate appointment of the special prosecutor, we hope we get sent back to the trial court for a new trial, we'd ask this court also to significantly consider the abuse of an excessive sentence that was imposed by the trial court. I have a question. Based on the recording, it was a two-hour recording? They did, and it's not clear from the record because the whole thing was played. I don't think it was after talking to my client. But it was mentioned that they would play the whole two hours, but the defense was objecting, you can't play the snippets of it. I don't believe a two-hour recording. The defense requested the entire videotape be played? The defense did, yes. In fact, I think when the court said this is only going to be considered as impeachment, the defense took a step back on the issue. I'm not arguing that was right. None of it should have come in. Thank you very much, Mr. Branstetter. Mr. Arado? May it please the court. Good afternoon, Your Honors. Thomas Arado on behalf of the people. Also from the State's Attorney's Appellate Prosecutor, which is apparently being assailed in this particular case. So I would like to present that argument first. In this case, there was an allegation that the State's Attorney had a conflict which required that he be recused. The trial judge denied that. The State's Attorney then filed a motion for the appointment of the Special Prosecutor from the State's Attorney's Appellate Prosecutor. Our office is governed by the Enabling Act, the Appellate Prosecutor Act, which allows for the appointment of the State's Attorney to request a Special Prosecutor. It does not set forth any particular reason or requirement for when a State's Attorney must ask for the prosecutor. He simply can say, I believe there's a conflict, there might be an appearance of impropriety, or I just don't feel like prosecuting this particular case and can request a Special Prosecutor. The requirements of the statute were met. Ed Parkinson appeared on behalf of the court, on behalf of the State's Attorney's Appellate Prosecutor, and then entered his appearance, and an order was subsequently entered that met the requirements of the State's Attorney's Appellate Prosecutor Act. When they recused themselves and requested the Special Prosecutor, did they give any reason for their refusal? At that point, no. The State's Attorney, Mr. Brady, did not state in his motion why he was asking for a Special Prosecutor. But there's no requirement under the Act that they must do so. Does your office, if they state a reason, if there's a conflict of interest, as opposed to, I know in some circumstances, the county lacks the financial resources, do you approach a case differently? I don't think, no. Once you get appointed Special Prosecutor, you take over the entire case. It is not a matter of relying upon the State's Attorney's Office for input or advice about a particular, how to try to get to a case. If there is a conflict of interest, and then you are assigned all of the prosecution, is conversing and utilizing the staff of the conflicted State's Attorney's Office, is that proper to do that? And if the reason that you're acting is because you are there to alleviate a conflict of interest, then you can declare, is it appropriate then to use the conflicted attorney and his staff to prepare and to gather documents? It is not a problem. It is as if the State's, well, let me back up the track a little bit. When you have a State's Attorney, such as in Shriver and Price, that had an actual appearance on behalf of the defendant, and then the Assistant State's Attorneys handle the prosecution, there's been held that there's no conflict. So the mere fact that the Special Prosecutor is using some of the resources of the State's Attorney's Office, and not the State's Attorney himself who has the alleged conflict, is not improper, no. The other thing I should point, even though after the trial was over, and the motion for a new trial is when this came up, that the complaint was put on the record, oh, they're in there all the time. No effort was made during the trial to put on the record what any of the alleged interactions were, other than at the close, oh, they're doing things for him. Nothing on the record about any communication. Nothing on the record about what the substance of any communication was. So even if you can find that State's Attorneys had interaction with the Office, again, the Office of the State's Attorney, not the State's Attorney himself. At no point was there any allegation that the State's Attorney, who is alleged to have had the conflict, interacted with the appellate prosecutors, the Special Prosecutors. He did appear in court, right? He showed up in October. I mean, it's not just that he was there, but it appears in the record, I don't know, from the docket perhaps, that he came about the defendant's motion to sever, and for a scheduling conference and jury setting, and to enter the appearance, and when Mr. Smith entered his appearance. So, I mean, at some point he actually was there, but this is before, I guess, the appointment of the Special Prosecutor. Correct. And after that, you're saying that he no longer appeared, and even if his office did work, that doesn't make sense. Correct, Your Honor. Okay. So, you know, our office takes our responsibilities very seriously and would not, obviously I personally wasn't present, but there's no indication in the record that anything improper occurred. And, in fact, the trial judge, when this came up, specifically made a finding that nothing improper occurred. So, you know, essentially the defendant is relying upon conjecture and speculation about what might have been communicated or what might have happened between the, again, it's between the office and the Special Prosecutors, not the State's Attorney himself, who was alleged to have had a conflict. So, I don't think I will spend a lot of, we've addressed in the record why we don't believe Mr. Brady had an actual or per se conflict of interest. I don't think we need to go into that unless you have any specific questions about that in contact. All right. Thank you. The other, the next issue, the closing of the courtroom, this was an administrative function in the first instance. You know, the trial judge said, I want to find out the availability of the jurors. That was it. No substantive issues were ever addressed. Nothing happened. It was during a break in the proceedings. The courtroom naturally exited the court, put on the record that there were still two people present in the courtroom, and, of course, the parties. But there is no indication in the record that anyone was actually denied access to the courtroom. And I've cited a couple of cases that require that the burdens on the defendant show that someone was actually denied access. And there is no proof in the record that anyone was actually denied access. As far as no proof when the courtroom was opened, I realized that in the record where the trial judge specifically said when he was unlocking the courtroom. So there isn't any indication that it was for an extensive period of time. There's no indication that anyone was actually denied access. And the second instance was when, during closing argument, apparently somebody was getting up and moving in and out. The trial judge simply said, you're in or you're out. He wanted bailiff out there to prevent anybody from coming in. But, again, we don't know if anybody was actually denied access. We don't know if the person who was the trial judge directed left or came and sat back down. There's nothing in the record to indicate that there was any denial or any prejudice of the defendant regarding the trial judge's restrictions that he imposed. Therefore, again, without anything in the record to support that, this Court should affirm the trial judge's. It's undisputed, though, he locked the door when they were discussing jurors' availability. True. It's undisputed that he directed there be locked. However, it is nothing in the record saying that anybody tried to get in. And it's Berman and – How would one know? Well, as Berman put it – I suppose if you shook the door and said, let me in, somebody would know. But if you just opened the door and it didn't move. Right, and somebody would complain. How is it anybody expected to know or object? In that case, how is anybody expected to object if they're unaware? Well – What isn't the point of a bright line here? No, I think the bright line, as Berman pointed out, you can't suppose that somebody was actually denied. If you lock the door and nobody tries to get in, your point is, how do we know anybody tried to get in? Well, the burden is on the defendant, as the court in Berman pointed out, could have asked for – put something on the record that somebody was denied access, gotten somebody to complain that there was somebody who was denied access. There's things that the defendant could have done under Berman and Lane to establish that there was access. There's a secrecy, though, to saying there's two people here and then locking the door, presumably when those two people were no longer there. There's a secrecy that shouldn't – was it two people in the courtroom as they were talking about the jurors' availability? Yes. And the judge wanted them gone. No, no, those people were not removed from the courtroom. They were not. They were not, no. The doors were locked at that point? Correct. There's still a secrecy, though, that we don't really tolerate under our system of justice. A judge – and I know this is an experienced judge, but normally you send the jury back to the jury room and you say, discuss it amongst yourselves. I would like to start this day or that day. And then after you've discussed it, send your foreman out and let me know if that's going to work or not. But to close the courtroom, to have that discussion with the judge, it just seems to me to be a little suspicious. Suspicious? I have no idea why a judge would do it this way, so give me some ideas why. Well, you want to put it on the record rather than have it simply about how he was conducting it. The suggestion was that, oh, he could have had an in-camera discussion with the jury. Well, how is that any different from closing the courtroom and still taking the jurors out from the public view of the trial? What was the issue? I mean, did they want to continue it two weeks or one day or two hours, or what was the issue? Availability for the following week, I believe, because the trial, I guess, was going on for perhaps longer than the judge anticipated and wanted to make sure that people were available. I think he said for the following Monday. The point is, though, why is this a big deal, one or the other? I think there's a cumulative problem here. We have a judge who is closing the courtroom, a judge who is imposing these really harsh sentences, a judge who first denies a special prosecutor and then the state says, wait a minute, wait a minute, now we want it. There's this theme running through this particular trial that doesn't suggest a neutrality that we like to see, I think, in court. I guess you can't respond to that little speech I just gave you, so go ahead. I guess the only response is there's nothing. If I can point to anything in the record that says versus a special prosecutor. Well, when there's a secret process, it's very hard for anybody to figure out what went wrong behind closed doors. That's the problem. But it's on the record. So it's not exactly behind closed doors. And the trouble I have with the judge saying, well, the prosecutor did nothing wrong, how does the judge know what happens outside of the courtroom and why that assistant state's attorney is running in and out? I just, those are my concerns and you need to finish your argument. I keep interrupting you. I apologize. It's your private affair. Turning to, I guess, the video recorded statements, as far as Taylor's statements go, he specifically, we believe that they're admissible both as impeachment and as substantive evidence. Mr. Taylor was present during the alleged crime. He made a statement to, a radio tape statement, acknowledging his involvement and acknowledging the conduct of the defendant. When he got to trial, he acknowledged that he was present in the car, that he had called the defendant. But then, miraculously, when he gets to answer specific questions about what happened, he feigns lack of memory or claims he was on drugs or drunk at the time. The Illinois Supreme Court in Flores specifically addressed whether lack of memory can show an inconsistency. And they said it can. Secondly, this court in Leonard was poised with a different, a similar question regarding the admissibility of the testimony when the defendant claimed lack of memory and found that it was proper to admit it both as impeachment and certainly under 11510 for substantive evidence. So I believe that Mr. Taylor's testimony, there's no problem. Also, as Your Honor pointed out, the special prosecutors had set up, prepared a limited DBP of the inconsistencies in Mr. Taylor's statement. And it was defense counsel that insisted that all of the statement be introduced into the records of the jury. We believe that asking a judge to proceed in one way and then coming back and saying, oh no, no, no, you shouldn't have done that, should not be allowed to do that. At that point, they had said they were going to be admitted for impeachment, which is a lot different than being admitted as substantive evidence. The judge didn't say, I'm going to admit these as substantive evidence. I'm going to admit them for impeachment. So you're talking a whole different breed of cat there. And then they're instructed and it's argued later. And you're saying, well, now he can't argue that it was wrong to put that in. Well, he did make the objection. The judge made a decision that seemingly then he decides without argument of anyone that he's going to overrule and let that come in as substantive. And I don't see how Shorty – how does that qualify as substantive evidence? It qualifies because he was giving a statement regarding – he denied that he talked to the defendant. He denied that he – He wasn't an occurrence witness. I mean, he wasn't there, was he? He wasn't – I mean, no one ever says that Shorty was there the night of the murder. No, no, and Shorty was not – did not testify regarding that particular night. He was testifying regarding the following day. This would allow the defendant to present – I'm sorry, a witness to make a statement to police and then simply deny it even existed. That's the point of video recording these statements, to be allowed to make them admissible later at trial. When they – Thank you. For the purpose of preserving them should the defendant testify inconsistent. Again, for other reasons, we will present our brief review as the court affirmed. Thank you. Okay, thank you, Mr. Arado. Mr. Branstrader and your rebuttal. The – on the issue of the special prosecutor and what he was or wasn't doing in the courtroom, when the defense lawyer brought it up that it seemed that the state's attorney in Peoria County was trying this case and it was toward the end of the trial. The judge specifically said, I did not accuse the state's attorney's office, indicating there was no firewall, there was no screen between the special prosecutor and the state's attorney's office. Again, lending to the appearance of impropriety. And here, the person who had an attorney-client relationship with the defendant charged with murder was in the background, floating around, doing what needs to be done to get the special prosecutor to do the case. Wasn't the state's attorney seated in the courtroom with the victim's family? He was at one point, Judge, and I – when they made mention of the state's attorney, I don't know if they were specifically saying Mr. Brady, but somebody was there. And that's the problem about the way the special prosecutor got appointed on this, to do the situation and to address the conflict. The trial court should have said, you know something, here's how we're going to do this. We are going to build a firewall between your office and this prosecutor. You'll, of course, have subpoena power. You'll have an investigator, and that would have solved the problem. It's the same way with the closure. As pointed out by the court, the Sixth Amendment right to a public trial covers the entire proceeding. And the state made mention, well, if you did it in Canberra, what's the difference between that and closing the door? Well, we do a lot of things in Canberra, particularly with the jury during voir dire. Some people don't want to talk about their backgrounds in front of a courtroom full of strangers. And to make an efficient administration of justice, we do the voir dire in Canberra, with the parties present, with the judge. And if the judge had said, on the record, here's why I have to do this, here are my reasons. I've thought about alternatives. I can't think of any. Here's the overriding interest that I'm trying to protect, and this is how we're going to do it. If that wasn't said, it would lock the door. That violates Mr. Jordan's right to a public trial. With that, I will finish. Thank you very much for your attention. Thank you, Mr. Brents. Thank you both for your argument today. We will take this matter under advisement. Get back to you with a written disposition within a short day. And we'll now take a short recess for a panel discussion.